UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN HAMLETT,

Plaintiff,

v.

TAJ K. EVERLY, C.O.; CHRISTOPHER J. DILLON, C.O.;
GARY J. PERROTTA, JR.; ANTONIO M. ALBAN, C.O.;
THOMAS A. GERMANO, JR., C.O.; RICHARD T.
FLANAGAN; MICHEL BLOTT, JR.; MICHAEL D. FUNK,
SGT.; DONALD VENETTOZZI; MARILYN KOPP; D.
HEITZ; EDWIN UZU; AND MR. JOHANAMANN,

Defendants.

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Civil Action No.
21-cv-6663 (NSR)



Plaintiff, John Hamlett ("Plaintiff"), for his amended complaint against defendants, alleges as follows:

## **NATURE OF THE ACTION**

1.     At all relevant times , Plaintiff was incarcerated at the Green Haven Correctional Facility ("Green Haven") and under the custody and control of the New York State Department of Corrections and Community Supervision ("DOCCS").

2.     Between August 2018 and April 2019, multiple employees of DOCCS violated several rights that the United States Constitution guarantees to Plaintiff while they acted under color of New York State law.

3.     Pursuant to 42 U.S.C. § 1983, defendants are liable to Plaintiff for compensatory and punitive damages for their violations of his constitutionally protected rights.

4.     Plaintiff also is entitled to injunctive relief expunging his record of false charges filed against him and of which he was found guilty without due process of law.

5.     Plainiff demands a jury trial.

**PARTIES**

6.     Plaintiff is a natural person currently incarcerated by DOCCS at Shawangunk Correctional Facility.

7.     Defendant Taj K. Everly ("Everly") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019

8.     Defendant Christopher J. Dillon ("Dillon") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019.

9.     Defendant Gary J. Perrotta, Jr., ("Perrotta") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019.

10.     Defendant Antonio M. Alban ("Alban") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019.

11.     Defendant Thomas A. Germano, Jr., ("T. Germano") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019.

12.     Defendant Richard T. Flanagan ("Flanagan") is a natural person who was employed by DOCCS as a correctional officer at Green Haven between August 2018 and April 2019.

13.     Defendant Michel Blot, Jr., ("Blot") is a natural person who was employed by DOCCS as a correctional sergeant at Green Haven between August 2018 and April 2019.

14.     Defendant Michal D. Funk ("Funk") is a natural person who was employed by DOCCS as a correctional sergeant at Green Haven between August 2018 and April 2019.

15.     Defendant Donald Venettozzi ("Venettozzi") is a natural person who was employed by DOCCS as the director of special housing of DOCCS between August 2018 and April 2019.

15855458.2 4/27/2023

16.     Defendant Marilyn Kopp ("Kopp") is a natural person was employed by DOCCS as a hearing officer at Green Haven between August 2018 and April 2019.

17.     Defendant D. Heitz ("Heitz") is a natural person who was employed by DOCCS as a nurse at Green Haven between August 2018 and April 2019.

18.     Defendant Dr. Edwin Uzu ("Dr. Uzu") is a natural person who was employed by DOCCS as a physician at Green Haven between August 2018 and April 2019.

19.     Defendant Johanamann ("Johanamann") is a natural person who was employed by DOCCS as a correctional sergeant at Green Haven between August 2018 and April 2019.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because each of Plaintiff's claims arise from 42 U.S.C. § 1983.

21.     This Court has personal jurisdiction over each of the individual defendants because, upon information and belief, they are residents of the State of New York.

22.     This Court has personal jurisdiction over each of the individual defendants because each committed a tortious act within New York State that caused injury to Plantiff within New York State.

23.     Venue is proper in this district because Plaintiff resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

24.     On August 7, 2018, Plaintiff requested that Correctional Officer Denielle Germano ("D. Germano") place him on the list for "chow," "yard," and "commissary."

25.     D. Germano placed Plaintiff for chow but refused to place him on the list for both commissary and yard, stating that he would have to choose between the two options.

3

26.     Upon information and belief, the applicable rules and regulations of Green Haven did not require Plaintiff to choose between the two options.

27.     Plaintiff explained to D. Germano that she was mistaken in her belief that he had to choose between yard and commissary, but she refused to listen to him.

28.     Later that day, Everly refused to let Plaintiff engage in recreation and informed Plaintiff that he complains too much.

29.     Plaintiff subsequently filed three grievances with the Inmate Grievance Resolution Committee for (1) denial of recreation; (2) harassment; and (3) retaliation.

30.     Together, these three grievances alleged that D. Germano refused to comply with applicable rules and regulations governing yard and commissary and that Everly wrongfully denied Plaintiff recreation in retaliation for Plaintiff disagreeing with D. Germano.

31.     Upon information and belief, it is the common practice and standard procedure of Green Haven for staff to question an inmate who filed a grievance against a correctional officer.

32.     Upon information and belief, it is the common practice and standard procedure of DOCCS for staff to question an inmate who filed a grievance against a correctional officer.

33.     On August 14, 2018, Blot questioned Plaintiff about the three grievances that he filed against Everly and D. Germano.

34.     Upon information and belief, it is the common practice and standard procedure at Green Haven for staff also to question the correctional officer against whom an inmate filed a grievance.

35.     Upon information and belief, it is the common practice and standard procedure of DOCCS for staff also to question the correctional officer against whom an inmate filed a grievance.

4

36. Upon information and belief, on or around August 14, 2018, Blot questioned Everly about the grievances that Plaintiff filed against Everly in accordance with the common practice and standard procedure of Green Haven.

37. Upon information and belief, on or around August 14, 2018, Blot questioned Everly about the grievances that Plaintiff filed against him in accordance with the common practice and standard procedure of DOCCS.

38. Upon information and belief, Blot questioned D. Germano about the grievances that Plaintiff filed against her in accordance with the common practice and standard procedure of Green Haven.

39. Upon information and belief, Blot questioned D. Germano about the grievances that Plaintiff filed against her in accordance with the common practice and standard procedure of Green Haven.

40. Based on Blot's questioning of Everly and D. Germano, they had to have known about the grievances filed against them by Plaintiff.

41. Based upon information provided to Plaintiff, it is believed that Blot is Everly's uncle or that they are otherwise related.

42. Upon information and belief, Blot and Everly informally discuss events that occur at Green Haven outside the formal channels of their employment.

43. Upon information and belief, Blot informally discussed with Everly the grievances that Plaintiff filed against Everly outside the formal channels of their employment.

44. Upon information and belief, Everly incorrectly believed that Plaintiff had filed grievances against him prior to the events of August 7, 2018.

15855458.2 4/27/2023

45.     The inmate whose cell neighbored Plaintiff's (the "Neighboring Inmate") was a member of the Inmate Grievance Resolution Committee.

46.     The Neighboring Inmate shared a friendly relationship with Everly.

47.     Upon information and belief, the Neighboring Inmate lied to Everly to gain Everly's favor by falsely alleging that Plaintiff had been filing grievances at Green Haven.

48.     Shortly after the Neighboring Inmate lied to Everly about Plaintiff filing grievances at Green Haven, Everly approached Plaintiff and asked if he liked filing grievances.

49.     Upon information and belief, Everly asked Plaintiff this question to intimidate Plaintiff and to deter him from filing grievances, even though Plaintiff had not yet filed any grievance against him.

50.     Everly's question to Plaintiff regarding the filing of grievances indicated that Everly viewed the filing of grievances unfavorably and sought to discourage Plaintiff from the filing of grievances.

51.     Upon information and belief, by late-August of 2018, Everly either had actual knowledge that Plaintiff filed grievances against him for the events of August 7, 2018, or mistakenly believed that Plaintiff had filed grievances prior to that.

52.     On August 14, 2018, after Blot had questioned Plaintiff about the three grievances he had filed, Everly stopped Plaintiff as he proceeded to the yard and only let him proceed after the other inmates had passed by them.

53.     Upon information and belief, Everly stopped Plaintiff solely to prevent him from having access to the phone in the yard, since there is a limited number of groups that are permitted to use the phones due to time restraints.

6

54.    Upon information and belief, given the short time between Blot questioning Plaintiff about the three grievances and Everly delaying Plaintiff's access to the yard, it can be inferred that Everly had knowledge of the grievances that Plaintiff had filed against him.

55.    Upon returning from the yard that same day, Plaintiff noticed that items were missing from his cell.

56.    Other inmates informed Plaintiff that they saw Everly with the missing items.

57.    On August 15, 2018, Plaintiff returned to his cell to find that his broom had been taken and that items in his locker had been knocked over.

58.    Plaintiff questioned other inmates about the missing broom, and they informed him that they had seen Everly with it while on the gallery.

59.    During recreation that same day, Plaintiff informed Johanamann that Everly had taken items from his cell and that Everly had been harassing him.

60.    Johanamann responded, "what you want me to do?"

61.    Plaintiff answered Johanamann's question by stating that he would like Johanamann, as a correctional sergeant of DOCCS, to ensure that his co-workers and subordinates follow applicable DOCCS policies, procedures, and guidelines.

62.    Shortly after speaking with Johanamann, Plaintiff noticed Blot passing through the yard.

63.    Plaintiff approached Blot and informed him that Everly had taken items from Plaintiff's cell and that Everly had been harassing him.

64.    Neither Johanamann nor Blot took Plaintiff's concerns seriously and both failed to take any action against Everly.

65.     Shortly after Plaintiff spoke to both Johanamann and Blot about his concerns, and after recreation ended, Everly refused to let Plaintiff into his cell while other inmates' cells were open.

66.     When Plaintiff asked Everly to open his cell, Everly responded that he would do so whenever Everly was ready and said to Plaintiff that he "controls" and "owns" Plaintiff and that Plaintiff "belongs" to him.

67.     When Everly finally permitted Plaintiff to enter his cell, Plaintiff noticed additional items missing from his cell.

68.     That same day, Plaintiff wrote to the first deputy superintendent and the deputy chief investigator about needing to speak to them about Everly.

69.     Plaintiff learned through other inmates that Everly was planning to frame Plaintiff by planting contraband in his cell.

70.     Concerned that Everly would continue to take items from his cell or otherwise plant contraband in his cell, Plaintiff strung a thread across the bottom of his cell door that would break upon someone entering.

71.     On August 20, 2018, Plaintiff returned to his cell to find that the thread had been broken, which indicated that someone had been in his cell while he was away.

72.     Plaintiff notified the escorting correctional officer and requested that a sergeant be called to investigate.

73.     Plaintiff waited outside his cell until the escorting correctional guard returned with Everly.

74.     Everly informed Plaintiff that the sergeant would be called once Plaintiff entered his cell.

8

75.    Plaintiff reluctantly entered his cell and noticed that his razor was missing from his locker.

76.    Despite Everly's assurances that the sergeant would be called upon Plaintiff entering his cell, the sergeant never arrived to investigate.

77.    Upon questioning other inmates, Plaintiff learned that Everly had stolen his razor.

78.    Under applicable rules of Green Haven, Plaintiff could be keep-locked or placed in the Special Housing Unit ("SHU") if his razor could not be accounted for during the weekly inspection.

79.    When Plaintiff's cell block was released for yard, Everly again stopped Plaintiff until all the other inmates had passed by them.

80.    When Plaintiff finally reached the yard, he informed Funk that Everly took his razor from his cell and had been repeatedly stealing personal items from him.

81.    Plaintiff informed Funk that Everly's actions were becoming increasingly severe, which increasingly placed Plaintiff in risk of serious sanctions for conduct he did not commit.

82.    Plaintiff informed Funk that he feared Everly's increasingly bold conduct was going to continue escalating.

83.    Plaintiff informed Funk that he had reason to believe from other inmates that Everly intended to plant contraband in his cell.

84.    Funk informed Plaintiff that he "would take care of it."

85.    On August 21, 2018, Everly against stopped Plaintiff on his way to the yard.

86.    Everly instructed Plaintiff to place his hands on the wall and to take everything out of his pockets while under the stairs of H-Block.

87.    Plaintiff complied with Everly's instructions.

88.     Dillon, Perrotta, and Alban arrived as Everly was addressing Plaintiff and Plaintiff observed T. Germano descending the stairs and approaching them.

89.     Upon information and belief, T. Germano is the brother of D. Germano, against whom Plaintiff had filed grievances.

90.     As Plaintiff's hands were on the wall and feet spread apart, Everly slammed Plaintiff's head into the concrete wall.

91.     The blow to Plaintiff's head caused him to lose consciousness.

92.     Plaintiff has been informed by other inmates that they witnessed Everly, Dillon, Perrotta, Alban, and T. Germano punch, kick, mace, and beat Plaintiff's body with sticks while Plaintiff was unconscious or semi-conscious..

93.     Upon information and belief, Flanagan responded to the commotion and further participated in the assault of Plaintiff.

94.     Upon information and belief, Blot and Flanagan then dragged Plaintiff to the SHU instead of the hospital.

95.     Upon information and belief, all of the officers who participated in the assault on Plaintiff worked with each other in or around H-Block and had reason to know about the grievances that Plaintiff had filed against D. Germano and Everly and about the other complaints made by Plaintiff about Everly.

96.     While in the SHU, Plaintiff briefly regained consciousness as correctional officers were holding him up in the shower and washing the mace off him.

97.     During this moment of consciousness, Plaintiff noticed the blue uniform of a nurse nearby.

98.     Upon information and belief, Plaintiff fell back unconscious.

10

99.    The medical reports indicate that the nurse Plaintiff observed was Heitz.

100.    Despite Heitz being physically present while multiple officers supported Plaintiff's unconscious body in the shower, the medical reports omit the fact that Plaintiff had been unconscious.

101.    Plaintiff later awoke in a cell of the SHU to the sound of a rat nearby.

102.    Each day Plaintiff was confined in the SHU, Dr. Uzu came around to check on the medical needs of the inmates.

103.    Each time Dr. Uzu came near Plaintiff's cell, Plaintiff struggled to carry himself to the door of the cell and had to hang onto the bars to keep his body upright.

104.    Each time Dr. Uzu came near Plaintiff's cell, he informed Dr. Uzu that he was dizzy, was experiencing unbearable headaches, kept falling in and out of consciousness, and could not stand without supporting himself with the cell bars.

105.    Despite Plaintiff informing Dr. Uzu of his medical needs, Dr. Uzu never physically examined him.

106.    On August 21, 2018, Everly filed a false report against Plaintiff, which Dillon and Alban endorsed, that alleged that Plaintiff assaulted staff, made threats, engaged in harassment, and violated direct orders and frisk procedure.

107.    The false report led to a tier 3 disciplinary hearing for which Kopp served as the hearing officer.

108.    Kopp denied Plaintiff's request to call witnesses during the tier 3 disciplinary hearing who would testify that they observed Everly steal items from his cell.

109.    Kopp denied Plaintiff's request to call witnesses during the tier 3 disciplinary hearing who observed Everly, Dillon, Perrotta, Alban, T. Germano, and Flanagan engage in the unprovoked assault of Plaintiff.

110.    At least one of Plaintiff's proposed witnesses refused to testify because, upon information and belief, correctional officers had intimidated that witness from testifying.

111.    Plaintiff notified Kopp of the intimidation of his witnesses, but Kopp refused to investigate his concerns.

112.    Kopp denied Plaintiff his right to have any assistance with the tier 3 disciplinary hearing.

113.    Kopp prohibited Plaintiff from obtaining or introducing relevant documentary evidence during the tier 3 disciplinary hearing.

114.    Kopp improperly transcended his role as adjudicator and took on an investigatory duty by questioning witnesses off the record and outside of Plaintiff's presence.

115.    Kopp ultimately concluded that Plaintiff was guilty of the conduct alleged in Everly's false disciplinary report and sentenced him to forty-five days of solitary confinement in the SHU, without access to phone, packages, and commissary. Kopp also required Plaintiff to retake the A.R.T. program.

116.    Plaintiff appealed Kopp's determination to Venettozzi.

117.    Venettozzi wrongfully affirmed Kopp's determination despite the failures of Kopp to provide due process and while knowing that Everly assaulted inmates on occasions both before and after Everly's assault of Plaintiff.

15855458.2 4/27/2023

## FIRST CLAIM
### (Excessive Force)

118.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 117 of this Complaint as if set forth fully herein.

119.    On August 21, 2018, while acting within the scope of their duties as  New York State correctional officers, Everly, Dillon, Perrotta, Alban, T. Germano  and Flanagan punched, kicked, maced, and beat  Plaintiff's body with sticks while he was unconscious or semi-conscious.

120.    Plaintiff engaged in no harmful or threatening conduct to provoke the assault against him.

121.    The assault against Plaintiff served no legitimate state penal interest.

122.    The assault of Plaintiff and the injuries he sustained from it were disproportional to the risk of harm that he posed to himself, other inmates, or Green Haven staff.

123.    Everly, Dillon, Perrotta, Alban, T. Germano, and Flanagan violated Plaintiff's Eighth Amendment right to be protected against cruel and unusual punishment while acting under color of New York State law and are therefore liable to Plaintiff for compensatory and punitive damages under 42 U.S.C. § 1983.

## SECOND CLAIM
### (Retaliation)

124.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 123 of this Complaint as if set forth fully herein.

125.    Upon information and belief, the acts of harassment by Everly detailed above, the assault on Plaintiff by Defendants Everly, Dillon, Perrotta, Alban, T. Germano and Flanagan, and the filing of a false misbehavior report by Everly, Dillon and Alban, were all taken in retaliation for Plaintiff's exercise of his First Amendment right to file grievances.

13

126.    As detailed above, Plaintiff has reason to believe that each of these Defendants knew about the grievances and complaints made by Plaintiff and were motivated by a desire to punish him for exercising his right to file such grievances and make such complaints.

127.    The acts of retaliation taken by these Defendants were undertaken by them while acting under color of New York State law, and they are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

<h3 style="text-align:center"><u>THIRD CLAIM</u><br>(Failure to Protect)</h3>

128.    Mr. Hamlett repeats and realleges the allegations in Paragraphs 1 through 126 of the Complaint as if set forth fully herein.

129.    Despite having knowledge that Everly was harassing Plaintiff and was becoming increasingly bold in his harassment of Plaintiff, and that Plaintiff feared that Everly's behavior would escalate into a serious threat to his safety and security, Blot, Johanamann and Funk failed to intervene to protect Plaintiff.

130.    Blot, Johanamann, and Funk failed to protect Plaintiff from unnecessary pain and harassment while acting under color of New York State law in violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment and are therefore liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

<h3 style="text-align:center"><u>FOURTH CLAIM</u><br>(Deliberate Indifference to Medical Needs)</h3>

131.    Plaintiff repeats and realleges Paragraphs 1 through 129 of the Complaint as if set forth fully herein.

132.    Following his assault, and after he was taken to the SHU, Defendants Heitz and Uzu became aware that Plaintiff had been knocked unconscious and severely beaten, and that he

was experiences symptoms of a concussion, including a lump on the back of his head, short term memory loss and persistent migraines, dizziness and instability standing and walking, along with injuries to his face and jaw, left side pain in the rib/kidney area, back and hand.

133.    Plaintiff repeatedly made Defendant Uzu aware of his symptoms, and specifically requested examination by a neurologist, but Defendant Uzu ignored these symptoms and requests.

134.    Despite Plaintiff informing Dr. Uzu of his medical needs, Dr. Uzu never even physically examined Plaintiff.

135.    While acting within the scope of their duties as employees of New York State, Heitz and Dr. Uzu were aware of the extent and seriousness of Plaintiff's grave medical condition, including but not limited to his recurring symptoms of a serious concussion, and both refused to provide Plaintiff with necessary or appropriate medical treatment. Their inaction displayed a deliberate indifference to his serious medical complaints.

136.    While acting under the color of New York State law, Heitz and Dr. Uzu violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment and are therefore liable to Mr. Hamlett for compensatory damages under 42 U.S.C. § 1983.

### FIFTH CLAIM
**(Due Process)**

137.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 135 of the Complaint as if set forth fully herein.

138.    On August 21, 2018, Everly filed a false disciplinary report against Plaintiff, which Dillon and Alban endorsed, that alleged that Plaintiff assaulted staff, made threats, engaged in harassment, and violated direct orders and frisk procedure.

139.    The false report led to a tier 3 disciplinary hearing for which Kopp served as the hearing officer.

15

140.   As detailed above, Kopp denied Plaintiff's request to call witnesses during the tier 3 disciplinary hearing who would testify in support of his position, failed to take action to prevent the intimidation of witnesses, denied Plaintiff's right to have assistance in defense of the charges, denied his requests to obtain and introduce documents, and improperly questioned witnesses outside Plaintiff's presence without a record being made and presented to Plaintiff..

141.   Kopp ultimately concluded that Plaintiff was guilty of the conduct alleged in Everly's false disciplinary report and sentenced Plaintiff to forty-five days' confinement in the SHU, with forty-five days without phone, forty-five days without packages, and forty-five days without commissary. Kopp also required Plaintiff to retake the A.R.T. program.

142.   Plaintiff appealed Kopp's determination to Venettozzi.

143.   Venettozzi wrongfully affirmed Kopp's determination despite Kopp's violations of due process and knowing that Everly assaulted inmates on occasions both before and after Everly's assault of Plaintiff.

144.   While serving his sentence in the SHU, Plaintiff was forced to endure unusually harsh conditions. Despite his need for medical attention, he was consistently denied adequate medical care; he had to endure the presence of rats in and about his cell; and he had to endure the screams and rantings of other inmates housed in the SHU in close proximity to his cell. These conditions not only were markedly more severe than he would normally have had as an inmate in the general population, but they were significantly more harsh than the conditions inmates usually have to endure while serving time in the SHU.

145.   While acting under color of New York State law, both Kopp and Venettozzi deprived Plaintiff of liberty without due process of law in violation of the Fourteenth Amendment and are therefore liable to Plaintiff for compensatory damages under 42 U.S.C. §1983.

146.    Plaintiff also is entitled to injunctive relief expunging his record of the false charges that Kopp and Venttozzi found him guilty of without due process of law.

**WHEREFORE**, Plaintiff demands a jury trial and respectfully seeks the following relief:

(a) Compensatory damages against each of the defendants in an amount to be determined at trial;

(b) Punitive damages against Everly, Dillon, Perrotta, Alban, T. Germano, and Flanagan pursuant to Plaintiff's First Claim;

(c) Injunctive relief expunging Plaintiff's record of the false charges; and

(d) Such other and further relief as the Court deems just, proper, and equitable.

Dated: May 4 , 2023

_____
John Hamlett

15855458.2 4/27/2023



United States District Court

Southern District of New York

John Hamlett, plaintiff

V.

Taj K. Everly et al,

Defendants.

RECEIVED
MAY 08 2023
U.S.D.C.
W.P.

Affidavit of Service

7:21 CV 6663 (NSR)

I, John Hamlett, the plaintiff in the Above-matter being duly Sworn, deposes and says:

I have served a copy of the enclosed Amended Complaint to, Janice Powers, Esq. Assistant Attorney General, at Westchester Reginal Office, 445 Broadway, 5th Floor, White Plains, N.Y. 10601, by placing it in a post paid envelope, and depositing it a United States Postal Service mailbox, located at Shawangunk Corr. Fac. Wallkill, N.Y. 12589, on the 4th Day of May, 2023

Sworn to before me this
— Day of May, 20 —

notary Public

John Hamlett #08A0598
Shawangunk. Corr. Fac.
P.O. Box 700
Wallkill, N.Y. 12589

John Hamlett #08A0598
Shawangunk Corr. Fac.
P.O. Box 700
Wallkill, N.Y. 12589

RECEIVED
MAY 08 2023
U.S.D.C.
W.P.

RECEIVED
MAY 08 2023
PRO SE OFFICE

USM WP
SDNY

Pro Se (Intake) U.S.D.C.
Southern District of New York
Charles L. Brieant, Jr U.S.
Courthouse
300 Quarropas Street
White Plains, N.Y. 10601-4150

3^42

Legal Mail